# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF GEORGIA
# ATLANTA DIVISION

MELVIN R.,                 :
                                 :

     **Plaintiff,**          :
                                 :     **CIVIL ACTION FILE NO.**

**v.**                         :     **1:17-cv-02458-AJB**
                                 :

**COMMISSIONER, SOCIAL**   :
**SECURITY ADMINISTRATION,**[1] :
                                 :

     **Defendant.**        :

## O R D E R   A N D   O P I N I O N

Plaintiff brought this action pursuant to §§ 205(g) and 1631(c) of the Social Security Act ("the Act"), 42 U.S.C. §§ 405(g) and 1383(c)(3), to obtain judicial review of the final decision of the Commissioner of the Social Security Administration ("the Commissioner") denying his application for Supplemental Security Income ("SSI") and Disability Insurance Benefits ("DIB").[2] The parties consented to magistrate judge

---

[1]     Nancy A. Berryhill was the Acting Commissioner of Social Security beginning January 23, 2017. However, her acting status ended as a matter of law pursuant to the Federal Vacancies Reform Act, 5 U.S.C. § 3345 *et seq*. Pursuant to Fed. R. Civ. P. 17(d), a public officer who sues or is sued in an official capacity may be designated by official title rather than by name. Since Ms. Berryhill no longer is the Acting Commissioner, the Clerk is **DIRECTED** to identify Defendant by the official title rather than by name.

[2]     Title XVI of the Act, 42 U.S.C. § 1381, *et seq.*, provides for SSI for the disabled, whereas Title II of the Social Security Act provides for federal DIB,

jurisdiction.  (Dkt. Entries date 08/24/17 & 08/25/17).  For the reasons set forth below, the Commissioner's decision is **AFFIRMED IN PART AND REVERSED AND REMANDED IN PART**.

## I.    *PROCEDURAL HISTORY*

On June 19, 2013, Plaintiff filed his application for SSI and DIB alleging a disability onset date of June 10, 2012.  [Record (hereinafter "R") 198, 202].  These claims were denied initially on January 6, 2013, and upon reconsideration on April 4, 2014.  [R110, 135].  Thereafter, Plaintiff filed a written request for hearing.  [R155]. Plaintiff appeared and testified at a hearing before an Administrative Law Judge ("ALJ") on May 19, 2016, where he was represented by an attorney and a vocational expert ("VE") testified.  [R46-83].  On June 29, 2016, the ALJ denied Plaintiff

---

42 U.S.C. § 401, *et seq.*  The relevant law and regulations governing the determination of disability under a claim for DIB are nearly identical to those governing the determination under a claim for SSI.  *Wind v. Barnhart*, 133 Fed. Appx. 684, 690 n.4 (11th Cir. June 2, 2005) (citing *McDaniel v. Bowen*, 800 F.2d 1026, 1031 n.4 (11th Cir. 1986)).  Title 42 U.S.C. § 1383(c)(3) renders the judicial provisions of 42 U.S.C. § 405(g) fully applicable to claims for SSI.  In general, the legal standards to be applied are the same regardless of whether a claimant seeks DIB, to establish a "Period of Disability," or to recover SSI.  However, different statutes and regulations apply to each type of claim.  Many times parallel statutes and regulations exist for DIB and SSI claims. Therefore, citations herein should be considered to refer to the appropriate parallel provision as context dictates. The same applies to citations of statutes or regulations found in quoted court decisions.

2

disability benefits. [R11-24]. Plaintiff then filed an appeal with the Appeals Council, which was denied on June 1, 2017, making the ALJ's decision the final decision of the Commissioner. [R1-7].

Plaintiff filed this action on June 29, 2017, seeking review of the Commissioner's decision. [Doc. 1-4]. The answer and transcript were filed on November 13, 2017. [Docs. 7-8]. On December 13, 2017, Plaintiff filed a brief in support of his petition for review of the Commissioner's decision, [Doc. 11], and on January 12, 2018, the Commissioner filed a response in support of the decision, [Doc. 12], to which Plaintiff replied, [Doc. 14]. The matter is now before the Court upon the administrative record, and the parties' pleadings and briefs,[3] and it is accordingly ripe for review pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3).

## II.   *PLAINTIFF'S CONTENTIONS*

Plaintiff claims that the ALJ made the following errors:

1.   The ALJ failed to develop the record regarding Plaintiff's physical limitations.

2.   The ALJ failed to include any social functioning limitations in the RFC.

---

[3]   Neither party requested oral argument. (*See* Dkt.).

3

AO 72A
(Rev.8/8
2)

3.     The ALJ's rejection of Plaintiff's allegations is not supported by substantial evidence.

[Doc. 11 at 1].

### III. STATEMENT OF FACTS

#### A. Background

Plaintiff was born in February 1964 and was 48 years old on the alleged onset date. [R235]. Plaintiff completed high school and worked in the past as a delivery truck driver and scanner. [R239]. He alleges disability due to due to "dysthymic, depression, high blood pressure, lack of concentration, [and] knee problems." [R238].

#### B. Lay Testimony

Plaintiff testified before the ALJ in May 2016 that for the last three years he has lived by himself in a housing assistance program through a voucher. [R51-52]. He had a driver's license in the past, but never renewed it and took MARTA to the hearing. [R52]. He receives food stamps and goes to a soup kitchen, uses vouchers to pay for medications, and sometimes gets help from friends or charities. [R53, 60]. Plaintiff testified that he ran out of medications in 2015 because he was depressed and did not leave his apartment, but is currently on hypertension medication. [R58-59]. He

AO 72A
(Rev.8/8
2)

contends that he cannot work because of his depression, problems being social, and his medication makes him light-headed and dizzy. [R53-54].

Plaintiff testified that his depression began when his grandmother died in 2010 while he was living at the shelter at Peachtree and Pine. [R54]. He described that he was not social at the shelter and was kicked out for fighting with people who allegedly stole his things. [R55]. He experiences anxiety attacks when he uses the bus and it is crowded, and he has no friends. [R56]. Plaintiff participates in group therapy twice a week for depression, anxiety, and social skills. [*Id*.]. He confirmed that he was kicked out of Cecilia Mitchell's group therapy class because he disagreed with her, had an outburst, and that she told him not to come back. [R58].

Plaintiff testified that his primary doctor, Dr. Sanjay, was going to send him to physical therapy for his knee. [R61]. He described knee pain for which he takes Tylenol. [R62]. Plaintiff explained that he typically only sleeps for two hours at a time, awakens in the mornings at four a.m., and his knee feels okay when he awakens. [*Id.*]. When he is not at therapy, he watches television or reads for 15 or 20 minutes. [R63]. He said he typically naps around 11 a.m. or noon. [R69].

Plaintiff stated that he feels pain after walking for 15 minutes and has pain in his left big toe. [R64]. He testified that he can sit for 30 minutes before he gets restless

5

and moves. [R65]. When he grocery shops, he buys very little because it is hard to carry it while walking with a cane. [*Id.*]. He confirmed that he's had the cane for the last two years, which he requested at Grady, and uses it when his knee feels weak and his toe hurts. [R65-66].

Plaintiff said he could lift about 10 pounds at a time and stand for 15 minutes without shifting his weight. [R67]. Plaintiff confirmed that he has headaches about twice a week that last less than a day and which are helped by hypertension medication. [R68-69].

During the hearing, the ALJ made Plaintiff stand up and walk around, so he could "see how you move." [R72]. He made Plaintiff put his hands on the wall, raise his hands as high as he could, and tell the ALJ if it hurt. [*Id.*]. Plaintiff responded that his knee and big toe hurt when he puts pressure on them. [R73].

### C.    Medical Records

#### 1.    *Consultative Examinations*

On September 9, 2013, Hector Manlapas, M.D., a non-examining state agency medical consultant, opined that Plaintiff had no severe physical impairments. [R89].

On December 9, 2013, Plaintiff underwent a psychological consultative examination with Stephen Hamby, M.D. [R396-401]. Based on upon the examination,

AO 72A
(Rev.8/8
2)

Dr. Hamby opined that Plaintiff had a low to average intelligence and would be able to understand, remember, and carry out simple instructions. [R400-01]. He opined that Plaintiff would be able to sustain attention to complete simple tasks. [R401]. Further, he opined that Plaintiff would be expected to continue to have mild to moderate difficulties relating to supervisors and coworkers due to his lack of social motivation and tendency to become agitated and angered. [*Id.*]. Dr. Hamby also opined that Plaintiff would be of mild risk for psychiatric decompensation under stressful work conditions. [*Id.*].

On January 3, 2014, Robert Koontz, Ph.D., a non-examining state agency psychological consultant, opined that Plaintiff had no severe mental impairments. [R89]. Dr. Koontz opined that Plaintiff had mild restrictions of activities of daily living, and moderate difficulties in maintaining social functioning and concentration, persistence, or pace. [R90]. With regard to social functioning, Dr. Koontz opined that Plaintiff was moderately limited in his ability to interact appropriately with the general public, accept instructions, and respond appropriately to criticism from supervisors, and get along with coworkers or peers without distracting them or exhibiting behavioral extremes. [R93].

7

On reconsideration, Joseph Garmon, Ph.D., a non-examining state psychological consultant, affirmed the initial assessment that Plaintiff had no severe mental impairments. [R131]. Dr. Garmon opined though that Plaintiff only had mild limitations in activities of daily living, maintaining social functioning, and maintaining concentration, persistence, or pace. [*Id.*].

On April 3, 2014, Ronald Rosen, M.D., a non-examining state agency medical consultant, affirmed that Plaintiff had no severe physical impairments. [R120].

        2.    *Treatment Records*

Plaintiff received outpatient treatment at Saint Joseph's Mercy Care Services for hypertension, among other physical ailments, from January 7, 2010 through October 1, 2014. [R327-78, 403-20, 448-70]. His blood pressure was consistently elevated, and he frequently reported that he had run out of medication to treat it. [*Id.*]. Plaintiff began outpatient treatment at Grady Hospital Clinic for his hypertension on October 1, 2014, [R514-16], where he remained until September 30, 2015, [R528-30, 580-86].

On July 1, 2013, Plaintiff went to the emergency room for right knee pain with swelling and stiffness. [R302]. X-ray examination of his right knee revealed

AO 72A
(Rev.8/8
2)

osteophytes[4] around the medial and patellofemoral compartments.[5] [R303]. The attending physician diagnosed Plaintiff with likely early arthritis. [R302].

On April 22, 2013, Plaintiff began receiving mental health treatment at Grady's Central Fulton Community Mental Health Center because he wanted to be able to get back into society. [R300]. Based on their encounter, D. Latham, LCSW, assessed Plaintiff with depression and recommended him for psychiatric treatment and group therapy. [*Id.*].

On May 13, 2013, Plaintiff underwent a behavioral health diagnostic with Keith Wood, Ph.D. [R88-91]. Plaintiff reported that he was depressed all the time and had nothing to look forward to, nothing made him happy, he had mood swings, he slept

---

[4]     Osteophytes are common features of osteoarthritis and can contribute both to the functional properties of affected joints and to clinical relevant symptoms. Osteophyte formation is highly associated with cartilage damage but osteophytes can develop without explicit cartilage damage. Peter M. Van der Kraan, Ph.D., and Wim B. Van den Berg, Ph.D., *Osteophytes: relevance and biology*, Osteoarthritis and Cartilage, Vol. 15, Is. 3 (Mar.2007), available at https://www.sciencedirect.com/science/article/pii/S106345840600327X (last visited 8/22/2018).

[5]     The knee has three parts. The thigh bone (femur) meets the large shin bone (tibia) forming the main knee joint. This joint has an inner (medial) and an outer (lateral) compartment. The kneecap (patella) and the femur form a third joint, called the patellofemoral joint. https://www.medicinenet.com/script/main/art.asp?articlekey=8848 (last visited 8/22/2018).

AO 72A
(Rev.8/8
2)

excessively, was cautious about dealing with people to avoid conflict, and tended to get irritated easily. [R288]. He reported no close friends and complained that people disappoint him. [R289]. On examination, Plaintiff had a depressed mood and short attention span. [R290]. Dr. Wood diagnosed Plaintiff with dysthymic disorder. [*Id.*].

Plaintiff went to psychiatric treatment at Grady Behavioral Health with J. Wootten, M.D., for medication management and evaluation on August 12, 2013. [R393]. Plaintiff reported that his primary concern was that he isolated himself, did not enjoy life, and wanted help building relationships. [*Id.*]. He reported that he did not enjoy social events and that people irritated him. [*Id.*]. He exhibited some paranoia, reporting that he thought people were trying to scam him and that they whispered or talked about him. [*Id.*]. He also reported occasional homicidal ideation toward people who wronged him, but he did not have a plan or intent. [*Id.*]. Dr. Wootten diagnosed Plaintiff with dysthymic disorder versus major depressive disorder. [R395]. Dr. Wootten started Plaintiff on Celexa[6] 20mg and referred him to group therapy. [R394].

---

[6]    Citalopram, also sold under the brand name Celexa, is a selective serotonin reuptake inhibitor ("SSRI") that is often used to treat depression. https://medlineplus.gov/druginfo/meds/a699001.html (last visited 9/6/2018).

AO 72A
(Rev.8/8
2)

Plaintiff went to Grady Behavioral Health on October 21, 2013 for follow up after he was started on Celexa. [R383-85]. Jessica Cohen, M.D., increased Plaintiff's Celexa dose to 40mg because he reported a partial positive response to the lower dose. [R385]. She also re-referred him to group therapy. [*Id.*].

Plaintiff returned to Dr. Cohen on March 13, 2014 for his depression versus dysthymic disorder. [R438]. Plaintiff reported that he was still very irritable toward other people. [*Id.*]. He stated that he was hopeless and had given up on making close relationships. [*Id.*]. He also reported that he would still like to attend group therapy to work on his irritability toward others. [*Id.*]. He had been worried about potential side effects of Celexa, but Dr. Cohen advised him not to worry, and to make sure that he adhered to the medication schedule for Celexa. [R439].

On June 5, 2014, Plaintiff was seen at Grady Behavioral Health by Jessica Rollin, M.D., for medication management for his depression versus dysthymic disorder. [R493]. He had restarted taking his Celexa again and reported that his mood was okay, but that he was still very easily irritated at other people and still having a hard time with social interactions. [*Id.*]. Dr. Rollin advised Plaintiff to continue taking Celexa 40mg and referred him again to group therapy. [R495].

AO 72A
(Rev.8/8
2)

Plaintiff began group therapy with Cecilia Mitchell, LPC, on June 12, 2014. [R499]. He went to group therapy with Ms. Mitchell for five sessions until August 28, 2014. [R502-09]. By his last noted group therapy session, Ms. Mitchell noted that Plaintiff was at a standstill in his progress of breaking out of his isolation and having better social interactions with people. [*Id.*].

Plaintiff was seen at Grady Behavioral Health with Erika Heard, M.D., on August 28, 2014, for medication management. [*Id.*]. Plaintiff reported that he was experiencing some unwanted side effects from the Celexa and that the group therapy was not working for him. [R510]. Plaintiff reported having four bad days per week, and that he wanted to isolate himself alone due to increased irritability. [*Id.*]. Dr. Heard noted that Plaintiff appeared to have difficulty with interpersonal relations and mood dysregulation, and he easily erupted verbally towards others. [R511]. She switched Plaintiff from Celexa to Wellbutrin.[7] [R512].

Dr. Heard saw Plaintiff again on November 20, 2014, for medication management. [R518]. He reported full compliance with Wellbutrin and he thought it

---

[7]     Bupropion, also known by the brand name Wellbutrin, is an antidepressant that works by increasing certain types of activity in the brain. MedlinePlus, Bupropion, https://medlineplus.gov/druginfo/meds/a695033.html (last visited 9/6/18).

AO 72A
(Rev.8/8
2)

was helping him to be less irritable. [*Id.*]. Dr. Heard diagnosed him with dysthymic disorder and advised him to continue taking Wellbutrin. [R520].

On September 2, 2015, Plaintiff treated with Dr. Sanjay Chandrasekaran, M.D., for his depression, hypertension, right knee pain, and left toe pain. [R584-85]. On examination, Plaintiff had crepitus[8] upon flexion[9] and extension of his knee. [R586]. Dr. Chandrasekaran noted that Plaintiff was walking with a cane. [R584]. He advised Plaintiff to consider joint injections for his knee osteoarthritis. [R586].

On September 30, 2015, Plaintiff saw Dr. Chandrasekaran for a follow up of his toe and knee pain. [R590-93]. Plaintiff reported that he had weakness in his knee when using stairs. [R590]. Plaintiff was still walking with a cane. [*Id.*]. With his left toe pain, he had gotten a very loose fitting shoe to accommodate the bony prominence on his toe, which hurt with movement. [*Id.*]. Plaintiff reported that he still had anger problems associated with his mental health and that he had run out of Wellbutrin. [*Id.*]. On examination, Plaintiff had crepitus with flexion and extension of his knee. [R592].

_____

[8]      Crepitus refers to noise or vibration produced by rubbing bone or irregular cartilage surfaces together. *PDR Med. Dictionary* 409 (1st ed. 1995).

[9]      Flexion refers to inability to fully straighten the knee. Normal knee range of motion is 0 degrees extension and 140 degrees flexion; flexion less than 140 is less on those with flexion. https://www.physio-pedia.com/Flexion_Deformity_of_the_Knee (last visited 9/6/18).

13

For his left toe, Dr. Chandrasekaran advised him to wear a bunion pad. [*Id.*]. He also recommended that Plaintiff undergo joint injections, though Plaintiff had expressed nervousness about them. [R590, 592]. Dr. Chandrasekaran also noted that Plaintiff's blood pressure was well-controlled. [R592]. Additionally, he noted that Plaintiff had stopped taking Wellbutrin because he ran out and could not afford a refill, but advised Plaintiff to start taking the medication again. [*Id.*].

Plaintiff treated with Daniel Cucco, M.D., at Grady Behavioral Health for his dysthymic disorder in remission, with anxious distress, and persistent major depressive episode. [R594]. Plaintiff reported that he had run out of medication and had since found it more difficult to be out in public, so he had been isolating himself and had become more irritable again. [*Id.*]. Dr. Cucco diagnosed him with persistent depressive disorder, and restarted him on Wellbutrin. [R595].

### D.    Vocational-Expert Testimony

The VE testified that Plaintiff's past work as a delivery driver and scanner was light and unskilled. [R76]. The ALJ asked the VE what work Plaintiff could do if he had a light exertional level; could walk guarded and slow 10-15 feet across the room without an assistive ambulatory device or pain; frequently lift overhead to reach and pull; avoid climbing ladders, ropes, scaffold, and unprotected heights; frequently climb

14

stairs and ramps; occasionally crawl, stoop, or balance; frequently crouch; occasionally use a cane to walk a city block; perform simple tasks; avoid fast-paced jobs with time pressures. [R76-77]. The VE testified that, under those restrictions, Plaintiff could perform his past relevant work. [R77]. The VE testified that Plaintiff would also be able to do the jobs of parking lot or convenience store cashier (of which there are 20,000 jobs nationally), ticket seller (of which there are 14,000 jobs nationally), and warehouse checker (of which there are 6,000 jobs nationally). [R78-79].

The ALJ then altered the initial hypothetical to allow for: occasional climbing of ramps and stairs, overhead reaching, pulling, crouching, kneeling; sitting and standing at will; and poor ability to maintain attention and concentration, handle work related stressors, and keep a regular work schedule. [R79]. The VE testified that this would preclude all work. [*Id.*]. Plaintiff's attorney they asked the VE if his answer would change if Plaintiff had a poor ability to get along with coworkers, supervisors, or the public, and the VE responded that it would not. [R79-80].

## IV.    ALJ'S FINDINGS OF FACT

The ALJ made the following findings of fact:

1.    The claimant meets the insured status requirements of the Social Security Act through December 31, 2012.

15

2.	The claimant has not engaged in substantial gainful activity since June 10, 2012, the alleged onset date (20 CFR 404.1571 *et seq*., and 20 CFR 416.971 *et. seq.*).

3.	The claimant has the following severe impairments: arthritis, right knee pain, hypertension and depression (20 CFR 404.1520(c) and 20 CFR 416.920(c))

. . .

4.	The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925, and 416.926).

. . .

5.	After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform less than a full range of light work as defined in 20 CFR 404.1567(b) and 416.967(b). The claimant is limited to frequent overhead reaching, kneeling, crouching, and balancing; occasional crawling and stooping; and never climbing ropes, ladders, or scaffolds. He must also avoid unprotected heights. The claimant occasionally uses a cane. He requires this device when ambulating one city block in distance. Mentally, the claimant is restricted to simple tasks. He must avoid jobs requiring intense, rapid time pressures and job production quotas. With these restrictions, the claimant is able to maintain attention and concentration, and he is able to complete a normal workday at an adequate pace and schedule.

AO 72A
(Rev.8/8
2)

. . .

6.    The claimant is unable to perform any past relevant work (20 CFR 404.1565 and 416.965).

7.    The claimant was born on February 28, 1964 and was 48 years old, which is defined as a younger individual age 18-49, on the date the alleged disability onset date. The claimant subsequently changed age category to closely approaching advanced age application was filed (20 CFR 404.1563 and 404.963).

8.    The claimant has at least a high school education and can communicate in English (20 CFR 404.1564 and 416.964).

9.    Transferability of job skills is not an issue in this case because the claimant's past relevant work is unskilled (20 CFR 404.1568 and 416.968).

10.    Considering claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569, 404.1569(a), 416.969 and 416.969(a)).

. . .

11.    The claimant has not been under a disability, as defined in the Social Security Act, since June 10, 2012, through the date of this decision (20 CFR 404.1520(g) and 416.920(g)).

[R16-23].

17

AO 72A
(Rev.8/8
2)

In his evaluation of Plaintiff's claims, the ALJ found that Plaintiff had mild restriction in activities of daily living ("ADL") and social functioning, moderate difficulties in maintaining concentration, persistence, and pace, and no periods of decompensation. [R17]. As regards Plaintiff's ADL, the ALJ opined that the 2013 consultative psychological examination revealed that Plaintiff was able to take care of his own personal hygiene, manage his medications, prepare microwaveable meals, perform household chores, use public transportation, shop for goods and manage funds. [*Id.* (citing [R397])]. As regards, Plaintiff's social functioning, the ALJ found Plaintiff reported irritability and a tendency to socially isolate but was cooperative and polite during mental status examinations and "the evidence of record suggest at most mild difficulties in this areas as discussed in detail below." [*Id.* (citing [R398])]. As regards Plaintiff's concentration, persistence, and pace, the ALJ found that mental status examination demonstrated normal thought process, good attention and concentration, adequate memory, and average insight and judgment. [*Id.*]. Moreover, Dr. Hamby opined that Plaintiff could understand, remember, and carry out simple instruction as well as sustain his attention in order to complete simple tasks, but would be at a mild risk of decompensation under stressful work conditions. [*Id.* (citing [R400])].

The ALJ concluded that although Plaintiff's underlying impairments could reasonably be expected to produce his symptoms, his statements concerning the intensity, persistence, and limiting effects of them was not entirely consistent with the medical evidence of record. [R19]. With regard to Plaintiff's allegations of musculoskeletal pain and impairments, the ALJ concluded that a light exertion level fully accounted for them as his objective medical records from 2012 through 2014 reflected normal range of motion and limited treatment. [R19-20 (citing [R326, 337, 342, 350, 355, 361, 302-03, 307, 435-37, 576)]]. Moreover, the ALJ observed that Plaintiff frequently did not adhere to his prescribed hypertension medications plan but, when he did, this condition was controlled with treatment. [R20 (citing R302-25, 327, 339, 348-9, 353, 359, 361, 410, 415; 458, 460, 526-28, 530)]. As to Plaintiff's mental impairments, the ALJ reiterated that, although Plaintiff endorsed depression, psychiatric assessments in 2013 showed full orientation, normal insight and behavior, appropriate

AO 72A
(Rev.8/8
2)

mood and affect, and a GAF scores[10] ranging between 60[11] and 65.[12] [R21 (citing [R286-302, 333, 327, 342, 350, 355, 361, 383, 395])].

The ALJ accorded great weight to Dr. Hamby's opinion that Plaintiff could sustain concentration and attention to complete simple tasks, as it was consistent with his evaluation and mental status examinations from Plaintiff's treating sources. [R21 (citing [R401])]. However, he only gave some weight to Dr. Hamby's assessment that Plaintiff had mild to moderate difficulty relating in the workplace because, although Plaintiff endorsed a tendency to isolate, he acknowledged that he could react properly in social settings and was able to interact appropriately with numerous healthcare professionals. [*Id.*]. The ALJ accorded some weight to the opinions of non-examining

---

[10]    The Global Assessment of Functioning ("GAF") is a numeric scale (0 through 100) that considers psychological, social, and occupational functioning on a hypothetical continuum of mental health illness. *Diagnostic and Statistical Manual of Mental Disorders* 32-34 (4th ed., Text Revision, 2000) ("DSM-IV-TR").

[11]    A GAF score between 51 and 60 indicates "[m]oderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers)." DSM-IV-TR 34.

[12]    A GAF score between 61 and 70 indicates "[s]ome mild symptoms (e.g., depressed mood and mild insomnia) OR some difficulty in social, occupational, or school functioning (e.g., occasional truancy, or theft within the household), but generally functioning pretty well, has some meaningful interpersonal relationships." DSM-IV-TR 34.

AO 72A
(Rev.8/8
2)

state agency physicians because they did not examine Plaintiff nor review the evidence of record in its entirety. [R22 (citing [R84-109, 112-34)].

The ALJ concluded that, considering Plaintiff's age, education, experience, and RFC, sufficient jobs existed in the national economy that Plaintiff could perform, such as a cashier (DOT #211.462-010, light and unskilled),[13] a ticket seller

_____

[13]     The Dictionary of Occupational Titles ("DOT") defines the cashier position as follows:

> ticket clerk Receives cash from customers or employees in payment for goods or services and records amounts received: Recomputes or computes bill, itemized lists, and tickets showing amount due, using adding machine or cash register. Makes change, cashes checks, and issues receipts or tickets to customers. Records amounts received and prepares reports of transactions. Reads and records totals shown on cash register tape and verifies against cash on hand. May be required to know value and features of items for which money is received. May give cash refunds or issue credit memorandums to customers for returned merchandise. May operate ticket-dispensing machine. May operate cash register with peripheral electronic data processing equipment by passing individual price coded items across electronic scanner to record price, compile printed list, and display cost of customer purchase, tax, and rebates on monitor screen. May sell candy, cigarettes, gum, and gift certificates, and issue trading stamps. May be designated according to nature of establishment as Cafeteria Cashier (hotel & rest.); Cashier, Parking Lot (automotive ser.); Dining-Room Cashier (hotel & rest.); Service-Bar Cashier (hotel & rest.); Store Cashier (clerical); or according to type of account as Cashier, Credit (clerical); Cashier, Payments Received (clerical). May press numeric keys of computer corresponding to gasoline pump to reset meter on pump and to record amount of sale and be designated Cashier, Self-Service Gasoline (automotive ser.). May receive money, make change, and cash checks for

AO 72A
(Rev.8/8
2)

(DOT #211.467-030, light and unskilled),[14] and a warehouse checker (DOT #222.687-010, light and unskilled).[15] [R23].

_____

sales personnel on same floor and be designated Floor Cashier (clerical). May make change for patrons at places of amusement other than gambling establishments and be designated Change-Booth Cashier (amuse. & rec.).

[14] The DOT defines the job of ticket seller as follows:

Sells tickets for travel on ferryboats, street railroads, buses, and for admission to places of entertainment, such as skating rinks, baseball parks, stadiums, and amusement parks: Depresses key on ticket-dispensing machine that automatically ejects number of tickets requested by patron or tears tickets from roll and hands ticket to patron. Accepts payment and makes change. Answers questions concerning fares, routes, schedules, and reservations, and gives information concerning coming attractions. Keeps daily balance sheet of cash received and tickets sold. May fill reservations for seats by telephone or mail. May sell tickets from box office and be designated Cashier, Box Office (amuse. & rec.). May collect fares from repeat riders at amusement park and be designated Second-Ride-Fare Collector (amuse. & rec.). May collect fares from railroad passengers at station and sell commuter tickets and be designated Station Agent (r.r. trans.).

[15] The DOT defines the job of warehouse checker as follows:

Verifies quantities, quality, condition, value, and type of articles purchased, sold, or produced against records or reports. May sort data or items into predetermined sequence or groups. May record items verified. May be designated according to type of establishment as Warehouse Checker (clerical).

AO 72A
(Rev.8/8
2)

## V.    *STANDARD FOR DETERMINING DISABILITY*

An individual is considered disabled for purposes of disability benefits if he is unable to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A).   The impairment or impairments must result from anatomical, psychological, or physiological abnormalities which are demonstrable by medically accepted clinical or laboratory diagnostic techniques and must be of such severity that the claimant is not only unable to do previous work but cannot, considering age, education, and work experience, engage in any other kind of substantial gainful work that exists in the national economy. 42 U.S.C. §§ 423(d)(2)-(3), 1382c(a)(3)(B), (D).

The burden of proof in a Social Security disability case is divided between the claimant and the Commissioner.  The claimant bears the primary burden of establishing the existence of a "disability" and therefore entitlement to disability benefits. *See* 20 C.F.R. §§ 404.1512(a), 416.912(a).   The Commissioner uses a five-step sequential process to determine whether the claimant has met the burden of proving disability.    *See* 20 C.F.R. §§ 404.1520(a), 416.920(a); *Doughty v. Apfel*,

AO 72A
(Rev.8/8
2)

245 F.3d 1274, 1278 (11th Cir. 2001); *Jones v. Apfel*, 190 F.3d 1224, 1228 (11th Cir. 1999). The claimant must prove at step one that he is not undertaking substantial gainful activity. *See* 20 C.F.R. §§ 404.1520(a)(4)(i), 416.920(a)(4)(i). At step two, the claimant must prove that he is suffering from a severe impairment or combination of impairments that significantly limits his ability to perform basic work-related activities. *See* 20 C.F.R. §§ 404.1520(a)(4)(ii), 416.920(a)(4)(ii). At step three, if the impairment meets one of the listed impairments in Appendix 1 to Subpart P of Part 404 (Listing of Impairments), the claimant will be considered disabled without consideration of age, education, and work experience. *See* 20 C.F.R. §§ 404.1520(a)(4)(iii), 416.920(a)(4)(iii). At step four, if the claimant is unable to prove the existence of a listed impairment, he must prove that his impairment prevents performance of past relevant work. *See* 20 C.F.R. §§ 404.1520(a)(4)(iv), 416.920(a)(4)(iv). At step five, the regulations direct the Commissioner to consider the claimant's residual functional capacity, age, education, and past work experience to determine whether the claimant can perform other work besides past relevant work. *See* 20 C.F.R. §§ 404.1520(a)(4)(v), 416.920(a)(4)(v). The Commissioner must produce evidence that there is other work available in the national economy that the claimant has the capacity to perform.

AO 72A
(Rev.8/8
2)

*Doughty*, 245 F.3d at 1278 n.2.  To be considered disabled, the claimant must prove an inability to perform the jobs that the Commissioner lists.  *Id.*

If at any step in the sequence a claimant can be found disabled or not disabled, the sequential evaluation ceases and further inquiry ends. *See* 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4).  Despite the shifting of burdens at step five, the overall burden rests on the claimant to prove that he is unable to engage in any substantial gainful activity that exists in the national economy.  *Doughty*, 245 F.3d at 1278 n.2; *Boyd v. Heckler*, 704 F.2d 1207, 1209 (11th Cir. 1983), *superseded by statute on other grounds by* 42 U.S.C. § 423(d)(5), *as recognized in Elam v. R.R. Ret. Bd.*, 921 F.2d 1210, 1214 (11th Cir. 1991).

## VI.    SCOPE OF JUDICIAL REVIEW

A limited scope of judicial review applies to a denial of Social Security benefits by the Commissioner.  Judicial review of the administrative decision addresses three questions:  (1) whether the proper legal standards were applied; (2) whether there was substantial evidence to support the findings of fact; and (3) whether the findings of fact resolved the crucial issues.  *Washington v. Astrue*, 558 F. Supp. 2d 1287, 1296 (N.D. Ga. 2008); *Fields v. Harris*, 498 F. Supp. 478, 488 (N.D. Ga. 1980).  This Court may not decide the facts anew, reweigh the evidence, or substitute its judgment for that

AO 72A
(Rev.8/8
2)

of the Commissioner.  *Dyer v. Barnhart*, 395 F.3d 1206, 1210 (11th Cir. 2005).  If substantial evidence supports the Commissioner's factual findings and the Commissioner applies the proper legal standards, the Commissioner's findings are conclusive.  *Lewis v. Callahan*, 125 F.3d 1436, 1439-40 (11th Cir. 1997); *Barnes v. Sullivan*, 932 F.2d 1356, 1358 (11th Cir. 1991); *Martin v. Sullivan*, 894 F.2d 1520, 1529 (11th Cir. 1990); *Walker v. Bowen*, 826 F.2d 996, 999 (11th Cir. 1987) (per curiam); *Hillsman v. Bowen*, 804 F.2d 1179, 1180 (11th Cir. 1986)  (per curiam); *Bloodsworth v. Heckler*, 703 F.2d 1233, 1239 (11th Cir. 1983).

"Substantial evidence" means "more than a scintilla, but less than a preponderance."  *Bloodsworth*, 703 F.2d at 1239.  It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion, and it must be enough to justify a refusal to direct a verdict were the case before a jury.  *Richardson v. Perales*, 402 U.S. 389, 401 (1971); *Hillsman*, 804 F.2d at 1180; *Bloodsworth*, 703 F.2d at 1239.  "In determining whether substantial evidence exists, [the Court] must view the record as a whole, taking into account evidence favorable as well as unfavorable to the [Commissioner's] decision."  *Chester v. Bowen*, 792 F.2d 129, 131 (11th Cir. 1986) (per curiam).  Even where there is substantial evidence to the contrary of the ALJ's findings, the ALJ decision will not be overturned where "there is

26

substantially supportive evidence" of the ALJ's decision.  *Barron v. Sullivan*, 924 F.2d 227, 230 (11th Cir. 1991).  In contrast, review of the ALJ's application of legal principles is plenary.  *Foote v. Chater*, 67 F.3d 1553, 1558 (11th Cir. 1995); *Walker*, 826 F.2d at 999.

Also, a "court must consider evidence not submitted to the [ALJ] but considered by the Appeals Council when that court reviews the Commissioner's final decision." *Ingram v. Comm'r of Soc. Sec. Admin.*, 496 F.3d 1253, 1258 (11th Cir. 2007).  In reviewing this additional evidence, the court must evaluate whether this "new evidence renders the denial of benefits erroneous." *Id.* at 1262.  This means that the court must "determine whether the Appeals Council correctly decided that the '[ALJ's] action, findings, or conclusion is [not] contrary to the weight of the evidence currently of record.' " *Id.* at 1266-67 (quoting 20 CFR 404.970(b)).

## VII.   CLAIMS OF ERROR

### A.   Whether the ALJ failed to develop the record regarding Plaintiff's physical limitations.

Plaintiff claims that the ALJ failed to develop the record because, although Dr. Manlapas indicated that a consultative examination was necessary "to establish current severity" of Plaintiff's impairments, no such examination was ordered and the

AO 72A
(Rev.8/8
2)

ALJ found that Plaintiff's impairments were not severe after ordering Plaintiff to perform physical movements that he could observe.  [Doc. 11 at 14 (citing [R88]; *Marbury v. Sullivan*, 957 F.2d 837, 841 (11th Cir. 1992); *Holladay v. Bowen*, 848 F.2d 1206, 1210 (11th Cir. 1988))].

The Commissioner responds, first, that, since Plaintiff was represented by an attorney, the ALJ had no heightened duty to the develop the record.  [Doc. 12 at 15-16 (citing *Brown v. Shalala*, 44 F.3d 931, 934 (11th Cir. 1995); *Pennington v. Comm'r of Soc. Sec.*, 652 Fed. Appx. 862, 872 (11th Cir. Jun. 17, 2016))].  Second, the Commissioner responds that the record had sufficient medical and non-medical evidence–in the form of longitudinal medical records, evidence of Plaintiff's activities, opinion evidence from medical sources, and Plaintiff's own testimony–to assess Plaintiff's alleged impairments.  [*Id.* at 16 (citing [R18-22, 60-75])].  Third, the Commissioner points out that Plaintiff did not request a consultative examination.  [*Id.*].  Lastly, the Commissioner responds that the form cited by Plaintiff does not clearly come from a state agency medical consultant, as it merely opined that Plaintiff's physical impairments were non-severe based on the available evidence and, at any rate, after more evidence was submitted, the decision at the reconsideration level does not

AO 72A
(Rev.8/8
2)

indicate the a consultative exam was needed. [*Id.* at 17-18 (citing [R88-89, 119-20, 130, 113-15, 124-26])].

Plaintiff replies that an RFC is unsupported by substantial evidence in the absence of a medical opinion by a treating or examining physician. [Doc. 14 at 3 (citing *Walker v. Colvin*, No. 1:12-cv-02586-TWT-RGV, 2013 U.S. Dist. LEXIS 136590, at *58-59 (N.D. Ga. May 17, 2013))]. Plaintiff asserts that the ALJ had a duty to resolve conflicts in medical opinions but "cannot devise an RFC out of thin air based on raw medical data." [*Id.* (citing *Sneed v. Comm'r of Soc. Sec.*, No 6:13-cv-1453-Orl-TBS, 2015 U.S. Dist. LEXIS 34290, n.5 (M.D. Fl. Mar. 19, 2015))].

As a preliminary matter, the Commissioner is correct that the ALJ had no special duty to develop the record. The ALJ's duty to develop the record "rises to a special duty when an unrepresented claimant unfamiliar with hearing procedures appears before him." *Cowart v. Schweiker*, 662 F.2d 731, 734-35 (11th Cir. 1981) (quoting *Clark v. Schweiker*, 652 F.2d 399, 404 (5th Cir. July 17, 1981)). In the absence of the special duty, a plaintiff must make a more specific showing of prejudice of the failure to develop the record. *Kelley v. Heckler*, 761 F.2d 1538, 1540 n.2 (11th Cir. 1985); *see also Brown v. Shalala*, 44 F.3d 931, 935 (11th Cir. 1995).

AO 72A
(Rev.8/8
2)

Also, contrary to Plaintiff's assertion, an RFC from a treating physician is not required for there to be substantial evidence for the ALJ's RFC finding. *See Green v. Soc. Sec. Admin.*, 223 Fed. Appx. 915, 923 (11th Cir. May 2, 2007) (stating that the ALJ determines a claimant's RFC and noting that "[a]lthough a claimant may provide a statement containing a physician's opinion of her remaining capabilities, the ALJ will evaluate such a statement in light of the other evidence presented and the ultimate determination of disability is reserved for the ALJ") (citing 20 C.F.R. §§ 404.1513, 404.1527, 404.1545); *see also Langley v. Astrue*, 777 F. Supp. 2d 1250, 1258 (N.D. Ala. Apr. 12, 2011) (after discussing *Green* and other cases, concluding that "the law of this Circuit does not require[] an RFC from a physician"); *see also Packer v. Astrue*, No. CIV.A. 11-0084-CG-N, 2013 WL 593497, at *3 (S.D. Ala. Feb. 14, 2013) (noting that numerous courts have upheld ALJs' RFC determinations notwithstanding the absence of an assessment performed by an examining or treating physician, and rejecting *Coleman v. Barnhart*, 264 F. Supp. 2d 1007 (S.D. Ala. 2003) (in which the court found reversible error where an ALJ's determination was not directly supported by a treating or examining physician's physical capacities evaluation)), *aff'd sub nom. Packer v. Comm'r, Soc. Sec. Admin.*, 542 Fed. Appx. 890 (11th Cir. Oct. 29, 2013).

AO 72A
(Rev.8/8
2)

Therefore, the issue is whether a consultative examination was necessary. While the record supports Plaintiff's assertion that Dr. Manlapas indicated an exam was necessary in 2013, [R88], it also supports the Commissioner's assertion that, in 2014, Dr. Rosen concluded that no consultative examination was necessary, [R119]. Plaintiff offers no legal support for his assertion that it was reversible error for the ALJ to not order a consultative exam. [Docs. 11 and 14 *passim*]. Consequently, the issue is not properly before the Court. *See Outlaw v. Barnhart*, 197 Fed. Appx. 825, 827 n.3 (11th Cir. Aug. 10, 2006) (per curiam) (finding that the plaintiff waived an issue by failing to elaborate on the argument or provide a citation to authority regarding the argument). The law is well settled in this circuit that a legal claim or argument that has not been briefed is deemed abandoned and that mentioning an issue without providing specific argument in support is not sufficient. *Dawkins v. Glover*, 308 Fed. Appx. 394, 395 (11th Cir. Jan. 23, 2009); *Seay v. United States*, 166 Fed. Appx. 422, 423 (11th Cir. Jan. 26, 2006) (holding that appellant's mere statement that district court improperly dismissed his complaint on *res judicata* grounds without any substantive argument in support amounted to abandonment of his claims even though he argued the merits of his underlying claims). Moreover, issues only raised in passing and not clearly raised are deemed abandoned. *Ostborg v. Comm'r of Soc. Sec.*,

31

610 Fed. Appx. 907, 913 (11th Cir. May 29, 2015) ("Abandonment can occur when an appellant only makes passing reference to a claim.") (citing *Sapuppo v. Allstate Floridian Ins. Co.*, 739 F.3d 678, 681-82 (11th Cir. 2014) (explaining that appellant abandoned a claim when he did not address holdings of district court other than to make passing references to the holdings without advancing any arguments or citing any authorities to establish they were in error)). Likewise, when a party fails to respond to an argument or otherwise address a claim before the district court, the district court may properly deem the claim abandoned. *Jones v. Bank of Am., N.A.*, 564 Fed. Appx. 432, 434 (11th Cir. Apr. 25, 2014); *see also Clark v. City of Atlanta*, 544 Fed. Appx. 848, 854-55 (11th Cir. Nov. 15, 2013) (agreeing with the district court's determination that plaintiffs' failure to respond to defendants' summary judgment arguments with respect to excessive force and state law claims meant that the plaintiffs abandoned their claims); *Brooks v. Branch Banking and Trust Co.*, No. 1:15-CV-00186-SCJ, 2015 WL 3478169, at *4 (N.D. Ga. May 28, 2015) (explaining that plaintiff abandoned her claim when she failed to address defendant's argument for its dismissal).

Moreover, aside from the general assertion that a consultative examination would have further developed the record, Plaintiff does not point to what evidence, if any, he

32

anticipates obtaining from such an examination. First, this does not conform to the

Court's scheduling order which requires that:

> if the remand is for the purpose of taking additional evidence, such
> evidence must be attached to the brief, or, if such evidence is in the form
> of a consultative examination sought at government expense, Plaintiff
> must make a proffer of the nature of the evidence anticipated to be
> obtained.

[Doc. 10 at 1(c)]. Second, assuming Plaintiff did offer a legal basis for why such an

examination is not discretionary and conformed to the Court's scheduling order, to

warrant remand, Plaintiff would need to show that the failure to order a consultative

examination was not merely harmless error and would, in fact, have altered the outcome

of the ALJ's decision. Here, the Plaintiff has not argued, much less asserted any facts

showing, that Plaintiff was more physically disabled than the less than light work

limitations presented ALJ's RFC.

Lastly, Plaintiff correctly points out that the ALJ cannot perform a "mini physical

examination at the hearing and base the RFC determination from that[.]"

[Doc. 11 at 14]. However, Plaintiff points to no part of the ALJ's actual decision

wherein the ALJ used his observations of Plaintiff's physical movements at the hearing

as the basis for his decision. [*See id.*]. As a result, the Court finds that, even assuming

the ALJ's conduct at the hearing could be considered "a mini-physical examination,"

AO 72A
(Rev.8/8
2)

it was harmless error and not grounds for reversal. *See Walker v. Bowen*, 826 F.2d 996, 1002 (11th Cir. 1987) (applying harmless error analysis in Social Security case); *Diorio v. Heckler*, 721 F.2d 726, 728 (11th Cir. 1983) (applying harmless error analysis where the ALJ made an incorrect statement of fact); *Young v. Astrue*, No. 8:09-cv-1056, 2010 WL 4340815, *4 (M.D. Fla. Sept. 29, 2010) (an error is harmless if it "do[es] not affect the ALJ's determination that a claimant is not entitled to benefits."); *cf. Wright v. Colvin*, No. CV 313-079, 2014 WL 5591058, at *7 (S.D. Ga. Nov. 3, 2014) (finding harmless error despite ALJ's use of "sit and squirm" test and incorrect finding as to how long plaintiff was able to sit at the hearing).

As a result, Plaintiff fails to show that the lack of a consultative physical examination was reversible error. Accordingly, the Court **DENIES** Plaintiff's request for remand and **AFFIRMS** this portion of the Commissioner's decision.

**2.     The ALJ failed to include any social functioning limitations in the RFC.**

Under this assertion of error, Plaintiff actually makes several contentions, only one of which has merit. First, Plaintiff claims that the ALJ erred by finding Plaintiff had only mild social limitation and rejecting the opinions of Dr. Hamby–who opined that Plaintiff's limitations in this area were mild to moderate–and Dr. Koontz–who

34

opined that Plaintiff had moderate limitations in this area. [Doc. 11 at 15-16]. Plaintiff submits that the record supported these medical source opinions that Plaintiff has mild, if not marked, limitations in social functioning because he reports agitation and isolation, was asked to leave group therapy, and reported homicidal ideation. [*Id.* at 16-17 (citing [R55, 58, 288, 393, 493, 510, 594)]]. Plaintiff claims that this is harmful error because the VE testified that an individual with a poor ability to get along with coworkers, supervisors, and the general public and the limitations set forth in the RFC would preclude all work. [*Id.* at 17].

The Commissioner responds that there was substantial evidence in support of the ALJ's findings regarding Plaintiff's limitations in social functioning. [Doc. 12 at 19]. Specifically, the Commissioner points to Dr. Hamby's opinion which Plaintiff with mild to moderate limitations and the ALJ's conclusion that Plaintiff had mild limitations because he was able to interact with healthcare professionals. [*Id.* at 19-20 (citing [R21, 302, 333, 337, 342, 350, 355, 361, 384, 395, 399-400, 412, 417, 436, 438-40, 459-60, 494-95, 510-11, 519-20, 581)]]. The Commissioner concedes that Dr. Koontz assessed Plaintiff with moderate limitations, but asserts that the ALJ's explanation with respect to Dr. Hamby "likewise explains and support his implicit rejection of Dr. Koontz's opinion." [*Id.* at 20 (citing [R17])]. Moreover, the

AO 72A
(Rev.8/8
2)

Commissioner responds, the non-examining state agency physicians also assessed mild social limitations. [*Id.*].

To the extent that Plaintiff argues that the ALJ erred in concluding that he had no more than mild limitations in social functioning, the argument is rejected since the ALJ's decision is supported by substantial evidence. The Court agrees with the Commissioner that the ALJ provided sufficient reasons for assessing the mild social limitations despite Dr. Koontz's opinion that Plaintiff's limitations were moderate. In determining the weight of medical opinions, the ALJ must consider: (1) the examining relationship; (2) the treatment relationship; (3) evidence supporting the conclusions; (4) the consistency of the opinion with the record as a whole; (5) the medical expert's area of specialty; and (6) other factors, including the amount of understanding of disability programs and the familiarity of the medical source with information in the claimant's case record. 20 C.F.R. §§ 404.1527(c)(1)-(6), 416.927(c)(1)-(6). Here, the ALJ explained that he accorded to Doctors Hamby and Koontz according to these factors.

Properly, the ALJ accorded some weight (and not as much as treating or examining physicians) to the opinions of non-examining consultative physicians (which includes Dr. Koontz) because they were not examining and did not review the evidence

36

of record in its entirety. [R22]. Next, the ALJ's assessment of mild limitations is not necessarily inconsistent with the examining physician opinion, as Dr. Hamby opined that Plaintiff had mild to moderate workplace interpersonal limitations. Further, the ALJ explained his reasons for according less weight to Dr. Hamby's assessment of up-to-moderate social limitations, based on Plaintiff's interactions with healthcare professionals. [R21]. Therefore, the ALJ did not err because he applied the proper legal standards. *Washington*, 558 F. Supp. 2d at 1296; *Fields*, 498 F. Supp. 488. While Plaintiff may take issue with the eventual weight that the ALJ accorded to these opinions, it is not the Court's role to decide the facts anew, reweigh the evidence, or substitute its judgment for that of the Commissioner. *Dyer*, 395 F.3d at 1210.

Second, Plaintiff in his reply brief argued that the ALJ failed to consider the combined effects of all his impairments. [Doc. 14 at 4-5 (citing 20 C.F.R. §§ 404.1523, 416.923; SSR 96-8p, 1996 WL 374184, *5; *Sprinkel v. Berryhill*, No. 1:16-cv-182, 2017 WL 4172501, at *6 (S.D. Ga. Aug. 28, 2017), *report and recommendation adopted*, No. CV 116-182, 2017 WL 4125273 (S.D. Ga. Sept. 18, 2017))]. As this was an issue raised for the first time in Plaintiff's reply, the Court will not consider it. *See U.S. Commodity Futures Trading Comm'n v. Atha*, 420 F. Supp. 2d 1373, 1381

(N.D. Ga. 2006) ("[T]he court need not consider an argument raised for the first time in a reply brief.").

Third, Plaintiff appears to argue that the ALJ erred in not including social limitations in the RFC because the VE testified that a person with a poor ability to get along with coworkers, supervisors, and the general public and the limitations set forth in the RFC would preclude all work. [Doc. 11 at 17]. However, there is no evidence that Plaintiff had a poor ability to get along with coworkers, supervisors, and the general public, so there is no merit to this argument.

Nonetheless, the Court finds merit in Plaintiff's argument that the ALJ did not include mild limitations in social functioning in Plaintiff's RFC. [Doc. 11 at 16]. At step three, the ALJ is required to demonstrate that he has considered all of the claimant's impairments, whether severe or not. *See Jamison v. Bowen*, 814 F.2d 585, 588 (11th Cir. 1987); *Bowen v. Heckler*, 748 F.2d 629, 635 (11th Cir. 1984) (explaining that the ALJ must make "specific and well-articulated findings as to the effect of the combination of impairments"); *see also Alesia v. Astrue*, 789 F. Supp. 2d 921, 933 (N.D. Ill. 2011) (after determining that claimant's depression caused mild limitations in three functional areas, and thus was a non-severe impairment, ALJ erred by failing to include any such limitations in the RFC) (citing *Terry v. Astrue*, 580 F.3d 471, 477

AO 72A
(Rev.8/8
2)

(7th Cir. 2009) (when determining a claimant's RFC, an ALJ must consider the combined effect of all impairments, "even those that would not be considered severe in isolation")).

Here, having found that Plaintiff had mild limitations in interacting with coworkers and supervisors, [R17, 21], the ALJ was required to incorporate these limitations into the RFC.[16] *Sprinkel*, 2017 WL 4172501, at *5 ("There is no apparent explanation why, even assuming arguendo it was appropriate to discount Dr. Kline's opinion, the ALJ failed to include the mental limitations he credited in the RFC."); *Fischer v. Colvin*, No. 1:14-CV-196-WS-GRJ, 2016 WL 5858726, at *7 (N.D. Fla. Aug. 29, 2016) (reversing for, *inter alia*, finding mild limitations in social functioning but including no limitations in the RFC), *report and recommendation adopted*, No. 1:14CV196-WS/GRJ, 2016 WL 5858990 (N.D. Fla. Oct. 4, 2016); *see also Whipple v. Berryhill*, No. CV 316-071, 2017 WL 5492008, at *5 (S.D. Ga. Oct. 26, 2017) (concluding that error committed where ALJ misstated findings of state agency psychologists who opined that the plaintiff had mild difficulties in maintaining

---

[16]     In addition, the Court observes that the ALJ uncritically cited to Plaintiff's GAF scores, noting that, although a person with a GAF score of between 61 and 70 indicates generally that the person is functioning pretty well with meaningful interpersonal relationships, but that such a score indicates some mild symptoms or some difficulty in social, occupational, or school functioning.  [R21 & n.1].

AO 72A
(Rev.8/8
2)

concentration, persistence, or pace, and stating that plaintiff had no limitation in this area), *report and recommendation adopted*, No. CV 316-071, 2017 WL 5474570 (S.D. Ga. Nov. 14, 2017).

The Court has a "responsibility to scrutinize the record in its entirety to ascertain whether substantial evidence supports each essential administrative finding." *Walden v. Schweiker*, 672 F.2d 835, 838 (11th Cir. 1982) (citing *Strickland v. Harris*, 615 F.2d 1103, 1106 (5th Cir. 1980)). In this instance, for the reasons discussed above, the ALJ failed to make an "essential administrative finding"—i.e., a finding relating to the reason for his decision that the RFC is, in relevant part, less restrictive than those of the medical consultants opinions to which he gave at least some weight.

In this regard, the Court rejects the Commissioner's argument that in assessing Plaintiff's RFC, the "ALJ cited substantial evidence supporting and explaining his decision to exclude work-related social limitations from his RFC finding." [Doc. 12 at 19 (citing [R19-20])]. None of the examples that followed explained why the ALJ excluded Plaintiff's social functioning limitations from the RFC. Rather, the Commissioner's arguments go more to the Commissioner's correct arguments that (1) the ALJ was correct in rejecting the medical consultant's more restrictive assessment of moderate social functioning limitations, [*id.*], and

40

(2) Plaintiff's argument that the VE opined that poor social capabilities would preclude all work was irrelevant to this issue. [*Id.* at 20]. Instead, the Commissioner engages in improper post hoc rationalization by arguing that Plaintiff did not demonstrate that he had no useful ability to get along with anyone in the workplace, and that there was no evidence that Dr. Hamby opined that he could get along with others. [*Id.* at 21]. None of these arguments is based on a finding or conclusion contained in the ALJ's decision. A court may not accept appellate counsel's post hoc rationalizations for agency actions. *Baker v. Comm'r of Soc. Sec.*, 384 Fed. Appx. 893, 896 (11th Cir. June 23, 2010) (citing *FPC v. Texaco Inc.*, 417 U.S. 380, 397 (1974) (citation omitted)). If an action is to be upheld, it must be upheld on the same bases articulated in the agency's order. *Id.* (citation omitted); *see also Burlington Truck Lines, Inc. v. United States*, 371 U.S. 156, 168 (1962) (same); *SEC v. Chenery Corp.*, 332 U.S. 194, 196 (1947) ("[A] reviewing court, in dealing with a determination or judgment which an administrative agency alone is authorized to make, must judge the propriety of such action solely by the grounds invoked by the agency. If those grounds are inadequate or improper, the court is powerless to affirm the administrative action by substituting what it considers to be a more adequate or proper basis."); *Owens v. Heckler*, 748 F.2d 1511, 1516 (11th Cir. 1984). As a result, the Commissioner's argument in

41

briefing about the ALJ's decision on this issue is a post hoc rationalization, which the Court cannot consider.

This case is distinguishable from this Court's decision in *Kersh v. Berryhill*, No. 1:16-CV-02671-AJB, 2018 WL 1193625, at *11 (N.D. Ga. Mar. 6, 2018). There, the Court found no error in the ALJ's exclusion from the RFC the plaintiff's limitations in the area of concentration, persistence, and pace, because the ALJ relied on the plaintiff's admissions regarding her medication, activities of daily living, and social capabilities and on a physician's opinion of the plaintiff's capability in that area, which allowed the Court to conclude that the plaintiff's depression caused no more than minimal restriction in her ability to work. *See also Hubbard v. Comm'r of Soc. Sec.*, 618 Fed. Appx. 643, 647-48, 650 (11th Cir. July 27, 2015) (affirming where ALJ gave great weight to psychological consultant's opinion that mental impairment caused a mild restriction in activities of daily living yet included no mental limitations in the RFC, explaining that substantial evidence supported the decision because the consultant's assessment indicated that the plaintiff "suffered little or no limitation in daily activities based on her alleged impairment"); *Brumfield v. Berryhill*, Case No. 5:16cv253/EMT, 2018 WL 617036, at *7 (N.D. Fla. Jan. 29, 2018) (finding no error in the ALJ's failure to include mild mental limitations in the questions posed

42

to the VE where the ALJ specifically found that the limitations caused no more than a minimal limitations in the plaintiff's ability to perform basic mental work activities and the finding was supported by the record). There is no such finding by the ALJ in this case.

Accordingly, the Court concludes that the ALJ erred in not including in the RFC limitations about Plaintiff's social functioning, and for that reason, the Commissioner's decision is **REVERSED and REMANDED** for further consideration of Plaintiff's limitations in social functioning.

    **3.    The ALJ's rejection of Plaintiff's allegations is not supported by substantial evidence.**

Plaintiff claims that the ALJ erred by finding his statements inconsistent with the medical and other evidence of record. [Doc. 11 at 18]. Specifically, Plaintiff reiterates his argument that the ALJ impermissibly based his conclusions upon his courtroom observations of Plaintiff's movement and pain, rather than ordering a consultative physical examination. [*Id.* (citing *Carlisle v. Barnhart*, 392 F. Supp. 2d 1287, 1294 (N.D. Ala. 2005))].

The Commissioner responds, first, that an ALJ may rely partly on observations at the hearing to discount a Plaintiff's subjective complaints. [Doc. 12 at 23 (citing

43

*Norris v. Heckler*, 760 F.2d 1154, 1157-58 (11th Cir. 1985))]. Second, the Commissioner responds that the ALJ's decision never cited to these observations as a basis for discounting Plaintiff's subjective complaints. [*Id.* at 23-4 (citing *Macia v. Bowen*, 829 F.2d 1009, 1011 (11th Cir. 1987); *Cormier v. Comm'r of Soc. Sec.*, 522 Fed. Appx. 468, 470 (11th Cir. June 12, 2013))]. Third, the Commissioner argues that Plaintiff has not shown the ALJ's observations resulted in harmful error as the RFC accounts for extensive physical limitations. [*Id.* at 24 (citing *Shinseki v. Sanders*, 556 U.S. 396 (2009))].

As discussed in Part VII(A), *supra*, and pointed out by the Commissioner, Plaintiff cites to no part of the actual decision wherein the ALJ used his observations of Plaintiff's physical movements at the hearing to discount Plaintiff's subjective complaints. The Court also agrees with the Commissioner that Plaintiff has not shown that the ALJ's observations resulted in harmful error because the RFC accounts for many physical limitations. Moreover, Plaintiff has not stated, what, if any, additional limitations the ALJ discounted or overlooked in finding Plaintiff's subjective complaints were not entirely consistent with the objective and other evidence of record. As a result, if this was error, it was harmless.

AO 72A
(Rev.8/8
2)

Accordingly, Plaintiff fails to show that the ALJ's conclusion that Plaintiff's statements concerning his impairments were not entirely supported by the evidence of record was not reversible error and the Court **DENIES** Plaintiff's request for remand and **AFFIRMS** the Commissioner's decision on this enumeration.

## VIII. CONCLUSION

In conclusion, the Commissioner's decision is **AFFIRMED IN PART AND REVERSED AND REMANDED IN PART** for further consideration of Plaintiff's applications. Specifically, the Commissioner's decision is **REVERSED AND REMANDED** for further consideration of Plaintiff's claims in light of his mild limitations in social functioning, and **AFFIRMED** in all other respects.

The Clerk is **DIRECTED** to enter judgment in favor of Plaintiff.

**IT IS SO ORDERED and DIRECTED**, this the 10th day of September, 2018.

<u>ALAN J. BAVERMAN</u>
UNITED STATES MAGISTRATE JUDGE

AO 72A
(Rev.8/8
2)